BATEMAN v. UNITED STATES.
No. 13825.

United States Court of Appeals,
Ninth Circuit.
April 15, 1954.

Cameron Sherwood, Robert A. Comfort, Walla Walla, Wash., James Leavy, Pasco, Wash., for appellants.

William B. Bantz, U. S. Atty., Harvey Erickson, Sp. Asst. to U. S. Atty., Spokane, Wash., for appellee.

Before STEPHENS, BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

The appellants, Charles and Wallace Bateman, are brothers. Their counsel attempt to depict them as two ignorant, unsuspecting individuals, victims of a misplaced trust in the integrity and ability of an incompetent and drunken accountant. In order not to be misled by the doleful picture presented, we need keep in mind that appellants possessed the ability to amass a fortune within a few years by the exercise of a business acumen and foresight which establishes beyond question that intellects engineering such success must be charged with a perception keen enough to detect an omission of over one hundred thousand dollars in an income tax return.

Appellants were convicted of aiding and assisting in the preparation and filing of false and fraudulent partnership income tax returns for the year 1945 in violation of 26 U.S.C.A. § 3793(b) (1) and with wilfully attempting to defeat and evade taxes by filing false and fraudulent joint income tax returns on behalf of themselves and their respective wives in violation of 26 U.S.C.A. § 145(b). Appellant Charles was convicted of the same offenses for the year 1946.

In the years 1939 to 1944 appellants acquired considerable land near Kennewick, Washington, which they planted in wheat and from which operation they derived large profits. In 1944 they purchased the Kennewick Hotel. Wallace took charge of the farm property and he and his wife kept the books for that part of the partnership. They took no active part in the hotel business. Charles operated the hotel and employed a bookkeeper to handle the books.

In 1944 a group of eight men in Kennewick, including two professional gamblers, opened a "social club" in the basement of the Kennewick Hotel. Charles was an incorporator and president of the club. Large scale gambling was conducted in the club, one witness testifying that between $28,000 and $30,000 was on the table during a single card game.

Appellants did not maintain complete and adequate books and such records as they did keep were destroyed by fire in 1948; hence, the Government was forced to resort to the net worth method. The accountant produced by appellants as a witness admitted that the Bateman brothers received more than $52,944.41 unreported farm income and a substantial amount of unreported non-farm income for the year 1945. The Government computations showed $48,624.35 unreported income from sources other than the farm operations. With regard to the year 1946, the Government concedes that the farm income was correctly reported but introduced evidence to establish unreported non-farm income of more than $46,000.[1]

[1.] Wallace, the brother who operated the farm property, was acquitted on the 1946 counts.

That false returns were filed is admitted. The defense is that no intent to defraud or to evade taxes existed. In this connection appellants say they relied on their tax consultant, Isham, to properly prepare their returns and they signed the returns believing their income was correctly reported.

The theory advanced by the Government is that appellants furnished Isham false and incomplete information for use in preparing the returns and signed the returns knowing this false information to be incorporated therein.

Seventeen specifications of error are urged. We summarize them as follows: (1) voluntary disclosure as a bar to prosecution; (2) challenge of juror Dunlap for cause; (3) misconduct on the part of the prosecuting attorney and the court; (4) admission and exclusion of evidence; (5) impeachment of Government's witness Owens; (6) instructions to the jury; and (7) sufficiency of the evidence to support the verdict.

### (1) Voluntary Disclosure.

 Appellants claim that they voluntarily disclosed their tax liabilities to government agents prior to initiation of any investigation and, hence, were entitled to immunity from prosecution under announced Treasury Department policy and under the self-incrimination clause of the Fifth Amendment to the Constitution of the United States.[2] No disclosure of tax deficiencies was made until June, 1950, long after an investigation had been instituted by the Treasury Department. In April, 1948, the Collector of Internal Revenue received an anonymous letter naming Charles and Wallace Bateman as tax evaders. On June 7, 1948, the Collector forwarded the letter, together with appellants' returns for the years 1945 and 1946, to the Deputy Collector in Pasco, Washington, with directions to initiate an investigation. In December, 1948, agents visited appellants and had them sign Treasury Department Form No. 872, waiver of statute of limitations upon assessment of income taxes. Special agent Williams testified that waivers are procured only in active cases under investigation when it appears that an investigation may not be completed before the running of the period of limitations. He testified further that before a taxpayer is requested to sign Form No. 872 he is told that his tax return for the particular period in question is under examination and that the Government needs more time to investigate the matter. Absent a claim to the contrary, it must be assumed that the prescribed procedure was followed in the instant case. This we think was sufficient to put appellants on notice that they were under investigation. Claimed disclosure thereafter could not operate as a bar to prosecution. United States v. Lustig, 2 Cir., 1947, 163 F.2d 85; United States v. Weisman, D.C. Mass.1948, 78 F.Supp. 979. It was knowledge that an investigation was under way that motivated appellants to inform the Collector that their 1945 returns were erroneous. They then cooperated with the Government by handing over such books and records as were available.[3] Such disclosures as were made by appellants after investigation had been instigated were voluntary and not induced by Treasury Department promises of immunity. No constitutional rights were invaded. United States v. Lustig, 2 Cir., 1947, 163 F.2d 85; United States v. Weisman, D.C.Mass. 1948, 78 F.Supp. 979.

 It appears that not only was an investigation under way prior to the claimed disclosure but that appellants have never in fact made a full and complete statement of their tax liabilities.

2. In 1952 the Treasury Department announced that voluntary disclosure would no longer prevent recommendation for prosecution. Treasury Department Information Release No. S–2930, January 10, 1952, P–H Federal Tax Service, par. 18604–A, vol. 2, 1949.

3. It is to be noted that the hotel and club books and records were destroyed by fire in May, 1948 and the information contained therein was not available to the Government.

Unlike In re Liebster, D.C.Pa.1950, 91 F.Supp. 814, cited by appellants, the taxpayers in the instant case at no time filed or offered to file amended returns containing a correct report of their earnings for the years in question. In fact, it was late in the trial before admission was made that substantial sums of income were unreported. This partial disclosure was not a "voluntary disclosure" within the meaning of the Treasury Department's immunity policy.

#### (2) Challenge of Juror Dunlap for Cause.

Error is assigned because of the Court's refusal to sustain appellants' challenge of juror Dunlap for cause. On *voir dire* Dunlap stated that perhaps he had some prejudice against one of appellants' attorneys because he thought a friend of his did not get a fair deal in a mortgage foreclosure handled by said attorney. On further questioning he stated that he would not let his dislike for the attorney influence his decision as to the guilt or innocence of the attorney's present clients. In response to the Court's questions, he said that he would be fair and impartial to the defendants and decide the case on the evidence and the Court's instructions. The refusal to excuse juror Dunlap was a proper exercise of the Court's discretion.

#### (3) Prejudicial Conduct of the Prosecuting Attorney and the Trial Court.

Complaint is made that the prosecuting attorney was guilty of prejudicial misconduct by stating in oral argument that the Government would show that appellants failed to report their income for the years 1947, 1948 and 1949. Appellants were not charged with failure to report income for said years, but have *no just ground for complaint on this score*. In fact, they were favored by the Court's ruling excluding testimony of failure to report income in other years. Such evidence is admissible to show *intent or design to evade taxes*. Johnson v. United States, 1943, 318 U.S.

189, 63 S.Ct. 549, 87 L.Ed. 704; Hanson v. United States, 8 Cir., 1950, 186 F.2d 61. The Court took the precaution to caution the jury to disregard the prosecutor's remarks.

We have examined other alleged errors and find them to be without merit. For instance, the Court did not abuse its discretion in permitting cross-examination of appellants' character witnesses as to their knowledge of gambling in the Kennewick Hotel. This was within the range of legitimate cross-examination.

It is claimed that the jury may have read a prejudicial newspaper story concerning "rackets" which appeared during the time of the trial. The trial court took every required precaution in this regard. It had, prior to the appearance of the newspaper story, instructed the jury not to read the newspapers and cautioned the jury a second time when appellants called the Court's attention to the newspaper story in question. No showing was made that any member of the jury disregarded the admonition. At no time did appellants request that the jury be held together.

Rather trivial contentions are made to the effect that the trial court indirectly injected itself into the trial. We find no merit in them.

#### (4) Admission and Exclusion of Evidence.

The Court admitted evidence of gambling activities conducted in the Hotel Kennewick. Motions to strike were made and a request for an instruction to the effect that there was no proof of taxable income derived by either appellant from the "social club". The evidence was properly admitted and the requested instruction denied. The jury was entitled to consider it in determining whether there was unreported income from the gambling source. There was abundant evidence connecting appellants with the gambling operations and the jury could properly conclude that they received substantial amounts of unreported income therefrom.

Charles was an incorporator and president of the club located in the basement of the Kennewick Hotel, owned by the partnership and managed by him. He hired Allen Hiles to manage the club for $15 a day plus 10% of the gambling take when manager Thompson departed for parts unknown. The salaries of dealer Wayne Goucher and manager Allen Hiles were both paid out of the hotel account and Charles took care of their social security and withholding taxes. The slot machines in the club were owned by Charles. He reported that he received only $13 therefrom. Checks were cashed at the hotel desk to provide cash for gamblers to participate in the games and these checks were deposited in the Hotel Kennewick bank account. Charles filed club income tax return for the year 1945 stating thereon "No activity and no receipts" when in fact extensive gambling operations had been conducted by the club. Charles paid two gambling "I. O. U.'s" owed by manager Thompson to McWilliams for $1,500 and to Rock Richmond for $500. The club officers or members were never called together for a meeting. When the state officers demanded that the club be closed, Charles did so without consulting any of the members or officers.

There was testimony to the effect that each morning while the club was in operation the manager delivered a cigar box containing the proceeds from the previous night's gambling to Charles or the hotel clerk and the proceeds were deposited in the Hotel Kennewick account. A highly significant fact because the Government's net worth computations revealed that the hotel account contained $30,771.84 unreported income for the year 1945 and $44,780.21 for the year 1946.

Appellants produced testimony to the effect that the gambling receipts deposited in the hotel account were in payment of loans to the club and not income. The jury resolved this question against them.

Error is claimed in the admission of the 1941 partnership financial statement and testimony relating thereto. Appel-lant Charles Bateman testified that he had $13,000 in cash in 1941. The Government introduced a 1941 financial statement showing cash of only $100 submitted by Charles to the National Commerce Bank of Seattle. The statement was properly admitted as competent impeaching evidence.

Banker Tweet was called by appellants as a character witness. He was asked on cross-examination what he would say about the character of a customer who gave him a false financial statement. Admittedly the question was improperly phrased, but no objection was made and no prejudice could have resulted, since evidence of the false financial statement was then properly before the jury.

The trial court refused to permit appellants to show that tax consultant Isham made material mistakes in preparing returns for persons other than appellants and that he was given to excessive use of liquor. This was not error. Appellants were given wide latitude in cross-examining Isham for the purpose of establishing his incompetence as an accountant and tax consultant. Isham testified freely to computation errors made in the preparation of appellants' returns. The fact that he made mathematical errors in preparing returns for others could have no probative value. Its only effect would have been to allow the jury to draw inferences that inasmuch as he made mistakes in preparing other returns he would be likely to make mistakes in preparing appellants' returns. Such evidence would be cumulative at best since it is admitted that mistakes were made. Moreover, the excluded evidence would have opened up collateral issues tending to delay and unduly burden the progress of the trial. As the trial court pointed out, Isham made out hundreds of returns, and mistakes made in a few of them would be no indication of his competence unless a showing were made as to how many returns were prepared without a mistake.

The Court informed appellants that it would allow evidence as to Isham's so-

briety at the time he worked on their returns, but would not admit evidence to show that Isham was drunk when he made out returns for other persons. Appellants were permitted to extensively inquire into Isham's alleged addiction to alcohol, to which the jury could give such weight as it deemed proper on the question whether he was intoxicated at the time he prepared appellants' returns. The crucial issue was whether or not Isham made errors in preparing appellants' returns. That he made mistakes was admitted. Whether he made them drunk or sober would not change the situation.

Isham testified that he was hired to make out the tax returns from figures given him by appellants. He was paid $15 for each return and he was not employed to audit or verify the information given him. Appellants knew that he was not an attorney or a certified public accountant and certainly he was not paid as one. If full credit be given Isham's testimony that he made substantial errors in preparing the returns, there remain appreciable amounts of unreported income. Isham, however competent, could not report income of which he had no knowledge. The jury understandably refused to believe that appellants would innocently and unknowingly sign returns understating income of more than $100,000 in 1945 and $48,000 in 1946.

▇ Exhibit 1, a photostatic copy of Bateman Brothers 1944 partnership return, was admitted in evidence over objection. Agent Williams testified that the original return had been destroyed and the copy was a true reproduction of the original. This was a sufficient foundation for its admission. The 1944 return, as the 1947, 1948 and 1949 returns, was admissible to show intent, scheme or design to evade taxes in the years charged in the indictment. The underreporting of wheat income in the 1944 return lends substantial report to the Government's version of the case because that incorrect return was prepared by a local attorney and not by the alleged incompetent tax-consultant Isham.

▇ Objection was made to admission into evidence of Plaintiff's Exhibit 52, a summary of appellants' net worth for the years in question. The summary was based on evidence produced at the trial and appellants had ample opportunity to cross-examine the Government agents who prepared it. See, Hanson v. United States, 8 Cir., 1950, 186 F.2d 61. The agents qualified as experts and the attack on their qualifications went to the weight rather than the admissibility of the summary. The computations were necessarily estimates because appellants kept incomplete books and most of their records were destroyed by fire. Their objection to the summary is rendered largely academic by the fact that appellants' accountant admitted substantial amounts of unreported income. In the course of oral argument before us counsel for appellants stated that he did not think the admission into evidence of the Government's summary was prejudicial.

▇ Appellants contend that the trial court erred in refusing to admit evidence that in 1950 they filed petitions in the Tax Court protesting the assessment of tax deficiencies for the years 1945 and 1946. It is appellants' theory that their subsequent conduct in protesting the tax assessments was relevant to the issue of good faith because it tended to show that they honestly believed they owed no additional taxes.

The trial court correctly excluded the offered evidence as having no probative value in establishing appellants' state of mind at the time of the alleged criminal acts in 1946 and 1947.[4] In this connection we have appellants' admission to the Deputy Collector some four months before they filed petitions in the Tax Court that their 1945 and 1946 returns were incorrect. Out of their mouths comes a negation that at the time they protested the tax deficiencies they be-

---

4. Although appellants failed to correctly report income for the years 1945 and 1946, the false returns were actually signed and filed in 1946 and 1947.

lieved that they had correctly reported their income. Furthermore, the acts appellants rely upon to show good faith in 1946 and 1947 occurred in 1950, long after the Government had commenced its investigation and at a time appellants knew their returns were being audited. This self-serving evidence was properly excluded. United States v. Stoehr, 3 Cir., 1952, 196 F.2d 276, certiorari denied, 1952, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643.

### (5) Impeachment of Government's Witness Owens.

■ The Government attempted to impeach its witness Harry Owens. Objection was made by appellants. This objection should have been sustained because the Government was neither surprised or prejudiced by the witness's testimony. Kuhn v. United States, 9 Cir., 1928, 24 F.2d 910; Culwell v. United States, 5 Cir., 1952, 194 F.2d 808. However, the questions addressed to witness Owens and the answers given did not constitute prejudicial error. Owens' testimony was confined to the events leading to the formation of the social club. He denied that he made the statements attributed to him by Government agents and his denial ended the inquiry. No inadmissible matter was sought to be placed before the jury through the artifice of impeachment testimony as in Young v. United States, 5 Cir., 1938, 97 F.2d 200. The evidence in this case is overwhelming.

■ The jury's verdict should not be set aside for slight and inconsequential errors. It seems certain that "the error did not influence the jury, or had but very slight effect". Kotteakos v. United States, 1946, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557.

### (6) Instructions to the Jury.

Appellants assign some eight specifications of error relating to the charge to the jury, only one of which merits consideration. Involving the single issue of intent, appellants submitted 58 requested instructions filling 33 pages of the record.[5] We think the statement contained in the case of United States v. Olweiss, 2 Cir., 1943, 138 F.2d 798, 800, is particularly appropriate:

> "At some time, how long does not appear, before he began his colloquial charge the defendants handed to the judge fifty-four requests. Perhaps he would have been within his powers to disregard all of them, when presented in such number; at best the practice is exceedingly undesirable."

We turn to the contention that the trial court erred in instructing the jury on the element of intent. The portion of the charge complained of reads as follows:

> "You will observe that one of the elements of the offenses charged is that the defendants willfully attempted to evade or defeat payment of their just tax. Willful attempt means an intentional one, done with bad purpose or evil motive, and it is therefore necessary that the Government prove that in filing their income tax returns, the defendants thereby, with such purpose or motive, intended to evade or defeat the payment of some portion of their income tax. However, it is psychologically impossible for you to enter into the minds of the defendants and determine the intent with which they operated. You must, therefore, determine the motive, purpose and intent from the testimony which has been presented, and you will consider all of the circumstances disclosed by the evidence, bearing in mind that the law presumes every man intends the natural and probable consequences of his own voluntary acts."

■ Appellants argue that the giving of the phrase, "the law presumes that every man intends the natural and

---

5. Appellants' counsel made the following statement to the trial court: "We are amazed ourselves at the number of them. We just kept shoving them in."

probable consequences of his own voluntary acts," in effect instructed the jury that from the mere act of filing an incorrect return it may be presumed that appellants intended to evade their taxes. This is not the ground upon which the instruction was objected to in the trial court. Under Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S. C.A., failure to except to an instruction on the ground urged on appeal forecloses review of the question. Berenbeim v. United States, 10 Cir., 1947, 164 F.2d 679.

Although we would be justified in placing our determination of this question on the failure of appellants to comply with Rule 30, we deem it advisable to point out that the trial court correctly instructed on the element of intent.

 As often occurs counsel has singled out one instruction in claiming error without regard to the instructions considered as a whole. The instructions on intent, given by the Court, correctly stated the law, were plain and understandable, and left no room for doubt in the minds of the jurors. On this ques-

tion the Court charged the jury that it was incumbent upon the Government to prove beyond a reasonable doubt "that there was owing to the Government more tax than was shown in the return made by the defendants during the taxable years charged; that the defendants knew that there was owing more income tax than shown by the return; and that they wilfully attempted to evade or defeat any part of such tax by filing or causing to be filed a false return." The Court not only specifically charged that intent was an essential element of the offense, that is, bad faith, but that good faith was a complete defense.[6]

It is apparent that the jury was fully instructed that if appellants acted in good faith they should be acquitted.

### (7) Sufficiency of the Evidence to Support the Verdict.

 Appellants say the evidence is insufficient to support the verdict. We have reviewed the evidence in the light most favorable to the Government and find it amply sufficient to sustain the jury's verdict. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed.

6. On this point the Court instructed as follows:
"In order to secure conviction, it is necessary to prove that the conduct of the defendants was willful. The mere fact that the tax returns in question were made by another, is no defense. If, on the other hand, you believe that the defendants Wallace Bateman and Charles Bateman did not act willfully, but mistakenly, and errors, if any, were caused by the tax consultant or other person preparing the returns and there was no willful intent on the part of Wallace Bateman or Charles Bateman to evade taxes, but that their signing of the returns resulted from inadvertence and mistake, then *it is your duty to acquit* the defendants or either of them. * * *
"However, even gross carelessness, recklessness or negligence in the preparation or relating to the preparation of an income tax return, or honest errors of fact or of law, is not fraud, and before the jury can infer the existence of fraud in this case, they must find beyond a reasonable doubt from the evidence that either or both of the defendants will-

fully, with intent to evade their Federal income taxes, prepared or caused to be prepared a materially false income tax return reporting income of the defendants covering either or both of the tax years 1945 or 1946.
\* \* \* \* \*
"If you find from the evidence that these defendants sought advice and counsel with respect to their income tax liability for the years 1945 and 1946 from one whom they thought would properly and correctly prepare their income tax returns, and if you further find that the defendants honestly attempted to provide their tax consultant and advisor with all information reasonably necessary to enable the consultant to prepare correct income tax returns, and that the taxpayers when they signed the same, presumed they were true and correct, then your verdict should be not guilty, for there would be absent the element of knowing and willful intent to evade or to attempt to evade payment of income taxes, even though it now develops that said income tax returns were materially wrong."

680; Schino v. United States, 9 Cir., 1953, 209 F.2d 67. The evidence of guilt is so overwhelming that we find it inconceivable that reasonable minds could have found other than that the evidence excluded every reasonable hypothesis but that of guilt. Remmer v. United States, 9 Cir., 1953, 205 F.2d 277, 287–288.

Judgment affirmed.