**In re WHITE et al.**

**Nos. 1601, 1602.**

United States District Court
S. D. Mississippi, Jackson Division.

May 28, 1951.

Joseph E. Brown, U. S. Atty., Robert Hauberg, Asst. U. S. Atty., Jackson, Miss., for the Government.

Robert Ash, Carl F. Bauersfeld and John W. Cragun, Washington, D. C., Forrest Jackson, Jackson, Miss., for defendants.

MIZE, District Judge.

1. Petitioners are half-brothers, one of whom (Dan M. White) resides in New Orleans, Louisiana, and the other (J. H. White) in Jackson, Mississippi. Dan M. White is connected and has been during all times material hereto with the Industrial Finance & Thrift Corporation in New Orleans, which is engaged in the brokerage of loans from local finance companies over the southern states. Two of the local finance companies from which it accepts paper are the White System of Jackson, and Friendly Finance Company, located in Jackson, Mississippi, and were the companies through which J. H. White transacted business. Apart from the rediscount of paper of the two Jackson, Mississippi, companies with Industrial Finance & Thrift Corporation, there was no business connection between the Mississippi and New Orleans enterprises.

2. Criminal complaints have been filed with the United States Commissioner in the Southern District of Mississippi, charging each of petitioners with evasion of their 1944 Federal income taxes. The original returns filed by petitioners with the Collector of Internal Revenue at Jackson, Mississippi, for the years 1942, 1943, 1944, and 1945, were fraudulent. Each of the petitioners filed amended returns for the cal-

endar years 1942 to 1945, inclusive, in the circumstances set out separately as to each petitioner below, the amended returns being filed on dates as follows:

Dan M. White, Amended Returns
1942, filed between March 10 and 15, 1946
1943, filed April 1, 1946
1944, filed April 1, 1946
1945, filed May 29, 1946

John H. White, Amended Returns
1942, filed August, 1946
1943, filed early September, 1946
1944, filed September 6, 1946
1945, filed September 19, 1946

3. For many years, the United States Treasury Department has maintained a policy of not recommending criminal prosecution of taxpayers who have wilfully made a fraudulent tax return in those cases where the taxpayer, before an investigation of his returns is under way, makes what the Treasury calls a "voluntary disclosure" to some revenue agent or officer of his fraudulent misstatement. In 1946, this policy was known to the respective accountants in New Orleans and Jackson, Mississippi, who prepared the amended returns for the taxpayers, and by the agents of the Bureau of Internal Revenue who made an investigation of the returns of each of the petitioners. Under date of August 21, 1945, the then Secretary of the United States Treasury, Hon. Fred M. Vinson, writing as guest columnist in Mr. Drew Pearson's syndicated column "Washington Merry-Go-Round", announced the purpose of the Treasury Department to increase its efforts in the detection of fraudulent evasion of income taxes, and with respect to the "voluntary disclosure" policy stated as follows:

"The Commissioner of Internal Revenue does not recommend criminal prosecution in the case of any taxpayer who makes a voluntary disclosure of omission or other misstatement in his tax return or of failure to make a tax return. Monetary penalties may be imposed for a delinquency, for negligence and for fraud, but the man who makes a disclosure before an investigation is under way protects himself and his family from the stigma of a felony conviction. And there is nothing complicated about going to a Collector or other revenue officer and simply saying, 'there is something wrong with my return and I want to straighten it out.'"

This policy statement came to the attention of both petitioners. The Treasury policy was further publicized in a release to the press under date of Friday, October 5, 1945, which also came to the attention of petitioner Dan M. White.

### Separate Findings as to Petitioner Dan M. White.

4. From 1942 and until the latter part of 1945, petitioner Dan M. White was involved in matrimonial disputes with his first wife as a result of which he had disguised income on the books of the corporation with which he was connected, Industrial Finance & Thrift Company, for the purpose of preventing his former wife finding out his true income, and for the purpose of evading the payment of income taxes. At the time in October, 1945, that a final agreement was reached with an agent of his former wife, petitioner Dan M. White commenced assembling information necessary to straighten out his accounts to enable him to file amended returns, but he did not report his intention to file an amended return to the Collector of Internal Revenue at this time, and at no time did he advise the Collector of Internal Revenue that his returns were false and fraudulent, and that he desired to make a voluntary disclosure. By the time the final executed copy of the property settlement and agreement was received in February, 1946, he had information ready for a 1942 amended return and a good part of that required for 1943 and 1944, but did not advise the Collector of Internal Revenue. At that time, he signed his amended 1942 return and issued a check for it dated about March 10 or 12, 1946, and left it with his office with instructions to mail it to the Collector in Jackson, Mississippi, before March 15, 1946. He understood that he had until three years following the filing of each return within which to file a voluntary amendment, which understanding was shared by the Collector of Internal Revenue at Jackson, Mississippi. Thereupon, in the middle of February, 1946,

petitioner Dan M. White left for Arizona, on the advice of his physician, where he remained until about March 20, 1946. During the middle of March, 1946, petitioner Dan M. White corresponded with the Collector respecting the Collector's request that a 1943 return, in addition to that for 1942 already filed, be gotten in promptly apparently because of the effect of the Current Tax Payment Act. At that time, the Collector at Jackson was informed in writing that petitioner Dan M. White would amend his return for 1943 as soon as he returned to New Orleans.

5. Upon petitioner Dan M. White's return from Arizona, he employed a certified public accountant to assist him with his amended return. Thereafter, the accountant prepared the amended returns, which were filed as set forth in Finding 2, above, from information supplied by petitioner Dan M. White.

6. After Dan M. White returned from Arizona about the 20th of March, he engaged Mr. Lankston, the accountant, to prepare his amended returns and advised him why and that after he had made the mistake in the 1942 return, the amended return, he decided he needed the assistance of an accountant and wanted to make a full disclosure.

7. At this time he had already been informed that Mr. Cuvillier, an agent of the Department, had been to the office of the Industrial Finance & Thrift Corporation and was making an investigation of their books and that Mr. Cuvillier had suspended the final examination of those books until he returned.

8. An examination of the books of the Industrial Finance & Thrift Corporation would disclose that there was a discrepancy in the amount of return made by the corporation and with the aid of the original returns of Dan M. White it could be determined that Dan M. White had concealed his income.

9. On February 28, 1946, Cuvillier began the examination of the tax returns of the Industrial Finance & Thrift Corporation for the year ending July 31, 1944, during which examination the commission payments to Dan M. White were computed and the Thrift accounts were checked to the extent that an explanation of the discrepancies from Dan M. White became necessary. While he, White, was out of town from February 28, 1946 to about March 20, 1946, the revenue agent withdrew from further investigation until White should return.

10. When Cuvillier entered the office of the Industrial Finance & Thrift Corporation on February 28, he advised the persons in charge that he wanted to see Mr. White or Mr. McKinnon, officers of the company, and at that time Mr. White being out of town he told Mr. McKinnon he wanted to start an examination of the return of the company for the year ending July 31.

11. Soon after his examination started of the books of the Industrial Finance & Thrift Corporation he found that the return of compensation as shown by the books of the Corporation was $60,000, but upon checking he found as a matter of fact it aggregated $92,000. At this time he had not actually examined Dan M. White's return, but Mr. McKinnon was unable to explain it, and he was unable to get any explanation from any one there and was told that Mr. White was the only one who could explain those things and withdrew on or about March 15. Prior to his withdrawal it got to the point where he was unable to get any explanation from those in charge. The purpose of his withdrawal was to await the return of Mr. White in order to afford him an opportunity to explain if there was concealed income.

12. On March 26 he encountered Mr. Lankston, the accountant, and had a conversation with him in which Lankston stated he had been engaged to prepare an amended return for Mr. Dan M. White and Lankston told him he thought it would be better if he, Cuvillier, would wait until he, Lankston, finished with his audit.

13. At that time Lankston did not tell him that Dan M. White desired to make a voluntary disclosure of unreported income and that on April 8 he went to see Dan M. White and at that time Dan M. White did not advise him that he was making a

voluntary disclosure of unreported income, and that at no time did Lankston or Dan M. White report to Agent Cuvillier that he was making a voluntary disclosure of unreported income.

14. Agent Cuvillier did not have in his custody on either of those dates the original income tax return for 1944 of Dan M. White, but the investigation was proceeding as above stated and on April 14, 1946, William E. Logan, revenue agent, wrote the Collector of Internal Revenue at Jackson that his office in New Orleans had under consideration the income tax liability of Dan M. White for 1944 and requested that any amended return filed for Dan M. White be forwarded to him. On March 18, 1946, Dan M. White wrote the Collector of Internal Revenue at Jackson with reference to his 1942 amended return and stated that on his return to New Orleans he would prepare a corrected return for 1942 and 1943, but at no place in the letter did he mention the 1944 return nor did he state that he was intending to file a voluntary disclosure of unreported income for the year 1944 and on March 30, 1946, Lankston wrote the Collector at New Orleans that he was filing an amended return for the year 1945 in order to take advantage of the Louisiana community basis, but did not state that he had made a false return and intended to make a voluntary disclosure of unreported income.

15. Mr. Cuvillier in the meantime was selected as a conferee and the White cases were assigned on May 1 to Internal Revenue Agent E. D. Matheny and Special Agent Harold Holt of the Intelligence Unit for further investigation, and these two completed the investigation and on Nov. 17, 1948, took a sworn statement from Dan M. White and from J. H. White and before taking their sworn testimony they were advised of their right to have an attorney and that any statements they made could be used against them and after so being advised, each one made the voluntary statement as reflected by the record.

16. The petitioner Dan M. White is an experienced business man and very bright. He is a lawyer, having been admitted to practice law in Mississippi but has not engaged in the active practice of law and had only a short experience as a practitioner.

17. The petitioners Dan M. White and J. H. White both cooperated fully throughout the investigation and furnished to the agents all the books, documents, canceled checks and correspondence as requested, and they at no time were warned by the agents prior to the date the sworn statements were taken that the information they were giving to the agents would be or could be used against them.

18. At no time during the entire investigation did the government agents make any inducements or false representations or use any trickery or make any promises of immunity to either one of the petitioners in connection with the investigation.

19. The agents of the Government were duly authorized to make the investigation of the income tax returns and would have been able to have discovered the concealed income from an examination of the books of the Corporation and income tax returns as filed with the Government and the cooperation that was given by the petitioners was in response to questions touching their returns and which questions the agents had the right to ask them provided no false promises of immunity were given or threats or coercion made. The statements were all voluntarily given. The agents had a number of conferences, probably one hundred or more, with Dan M. White and a great number of questions were asked and explanations were given. The agents were permitted to take some of the records from Dan M. White's office in order that they might be copied or photostated and there are now in the files of the Department some of the copies or photostats but no originals. Neither of the petitioners was ever advised by any one of the agents or the Treasury Department that criminal prosecution was being contemplated nor did they tell either of the petitioners that criminal prosecution was not contemplated.

Separate Findings as to Petitioner
J. H. White.

20. John H. White commenced to assemble information necessary to amend his 1942-1945 returns in April, 1946, and em-

ployed a certified accountant, Mr. J. W. Cocke, to prepare these for him and engaged him about June or July. Mr. Cocke advised him of the voluntary disclosure policy and that it was advisable if he had no reason to believe he was under investigation by the Bureau to inform the Collector's Office immediately of his intention to make good. He filed his amended return for the year 1944 on September 6, 1946, but he did not advise the Collector of Internal Revenue that he had concealed income and desired to make a voluntary disclosure until the filing of his amended return.

21. The examination of J. H. White was started in July, 1946. The investigation of J. H. White was assigned to the agents in May, 1946, and after the investigation started, in July, 1946, they contacted Mr. J. H. White in Jackson and told him his returns for 1942–1945 had been assigned to them for investigation and asked if he intended to file any amended returns and he replied that his original returns were correct and he did not intend to file an amended return. This conference took place before the amended return was filed and after the investigation had started.

### Conclusions of Law.

1. I conclude as a matter of law that the petition to suppress the evidence should be overruled.

■■ 2. Admissions which are voluntarily made without any false promises or inducements are competent evidence against one charged with crime. The policy of the Government holds out to those who had failed to pay their income taxes and specifically stated that the voluntary disclosure must be made before an investigation is started. In this case it is clear that the investigation of J. H. White had started and it is reasonably clear that an investigation of Dan M. White had started. The agent, Cuvillier, discovered the discrepancies in February while investigating the Industrial Finance & Thrift Corporation and almost immediately Dan M. White returned, but at no time did Dan M. White tell the agent that his return for 1944 was false and that he intended to take advantage of the voluntary disclosure policy. If on that date he had written the Treasury Department or gone to an agent of the Department and said, "I have filed a false return and am now preparing to file an amended return and pay up the shortage", then the policy would be applicable but he chose not to do this and at no time did he advise the agents that his returns were false and he desired to correct them.

■ 3. There is a difference between admission and confession and where an intelligent man without false promises being made to him voluntarily makes admissions against his interest, he cannot be heard to say that his constitutional rights have been violated. See the case of Brister v. State, Miss., 51 So.2d 759.

■ 4. There was no unlawful search or seizure, but the search that was made was consented to and a reasonable one and violated no constitutional rights of the petitioners.

5. The facts of this case are different from the facts in the case of In re Liebster, D.C., 91 F.Supp. 814, and are more nearly like the facts of Application of Henry Lustig Company, D.C., 67 F.Supp. 306, Id., 2 Cir., 163 F.2d 85.

6. The relief sought by petitioners will be denied and their petition dismissed.